# LAW OFFICES OF SOLOFF & ZERVANOS

John N. Zervanos, Esquire

Identification No.# 49615

Jeffrey P. Fritz, Esquire

Identification No.#78124

1525 Locust Street, 8th Floor

Philadelphia, PA 19102

(215) 732-2260 Attorneys for Plaintiff

### UNITED STATES DISTRICT COURT FOR THE

### EASTERN DISTRICT OF PENNSYLVANIA

**ALAN FEHR** :

6365 Chestnut Hill Road :

Coopersburg, PA 18036 :

Plaintiff :

vs. : NO. 02-3145

: MAJOR JURY TRIAL DEMANDED

**TANNEWITZ, INC.** :

0794 Chicago Drive :

Jenison, MI 49428 : Defendant :

# ORDER

AND NOW, this day of , 2003, upon Consideration of the Motion for Summary Judgment of Defendant Tannewitz, Inc. and Plaintiff's Response thereto, it is hereby Ordered that Defendant's Motion is DENIED.

BY THE COURT:

Berle M. Schiller, U.S.D.J.

## LAW OFFICES OF SOLOFF & ZERVANOS

John N. Zervanos, Esquire

Identification No.# 49615

Jeffrey P. Fritz, Esquire

Identification No.#78124

1525 Locust Street, 8th Floor

Philadelphia, PA 19102

(215) 732-2260 Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF PENNSYLVANIA

**ALAN FEHR** :

6365 Chestnut Hill Road :

Coopersburg, PA 18036 :

Plaintiff :

vs. : NO. 02-3145

: MAJOR JURY TRIAL DEMANDED

**TANNEWITZ, INC.** :

0794 Chicago Drive :

Jenison, MI 49428 : Defendant :


## PLAINTIFF'S RESPONSE

## <u>TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>


Plaintiff, Alan Fehr, hereby responds to the motion for Summary Judgment of Defendant, Tannewitz as follows:

1. It is admitted that Plaintiff was injured and filed a complaint as averred and that Tannewitz denied all allegations. It is denied that Defendant is entitled to summary judgment for all the reasons outlined in the accompanying memorandum of law, which is incorporated herein by reference as though fully set forth.

2. Admitted. By way of further response, neither C.O. Porter Machinery Company nor Copco, Inc. exist, which gives rise to Plaintiff's assertions of the various theories of successor liability in the accompanying memorandum of law, which is incorporated herein by reference as though fully set forth.

3. Admitted in part. Denied in part. It is admitted that the saw was a 43-20J Hydra-cut saw manufactured by C.O. Porter Machinery Company. It is denied that it was sold on or about November 29, 1948. Rather, the saw bears the serial number 62-3697 designating a 1962 manufacture date. Bally Block owned two Hydra-cut saws and there exists no evidence the subject saw was sold in 1948.

4. Denied for all the reasons outlined in Plaintiff's accompanying memorandum of law, which is incorporated by referenced. By way of further response, the Model 47-A was a continuation of the Hydra-cut product line, which included the Model 43-J. Moreover, Defendant advertised and relied upon the good will of C.O. Porter's 43-J which in part subjects it to liability as a successor.

5. Admitted.

6.-7. Denied for all the reasons outlined in Plaintiff's accompanying memorandum of law, which is incorporated by referenced. By way of further response, Tannewitz continued to manufacture and sell the Hydra-cut saw product line, using its employees and profiting from the sales. At the very least, material issues of fact exist on all the allegations averred by Defendant in paras. 6.-7.

8. Denied. Plaintiff's claims for negligence include failing to warn owners and users of the older model saw of the defective design of the saw and its changes in design. Tannewitz had actual knowledge of the owners of the hydra-cut saw which caused Plaintiff's injuries. It is denied that Defendant is entitled to summary judgment for all the reasons outlined in the accompanying memorandum of law, which is incorporated herein by reference as though fully set forth.

9. Admitted.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Honorable Court dent Defendant's Motion for Summary Judgment and enter an appropriate Order.


**SOLOFF & ZERVANOS, P.C.**

**By:**

John N. Zervanos, Esquire

Jeffrey P. Fritz, Esquire

**Counsel for Plaintiff, Alan Fehr**

Dated: September 22, 2003

**LAW OFFICES OF SOLOFF & ZERVANOS**

John N. Zervanos, Esquire

Identification No.# 49615

Jeffrey P. Fritz, Esquire

Identification No.#78124

1525 Locust Street, 8th Floor

Philadelphia, PA 19102

(215) 732-2260 Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF PENNSYLVANIA**

**ALAN FEHR** :

6365 Chestnut Hill Road :

Coopersburg, PA 18036 :

Plaintiff :

vs. : NO. 02-3145

: MAJOR JURY TRIAL DEMANDED

**TANNEWITZ, INC.** :

0794 Chicago Drive :

Jenison, MI 49428 : Defendant :

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**

**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. FACTUAL HISTORY

The present case stems from the August 8, 2000 malfunction of a Hydra-Cut radial arm saw which is part of the Hydra-cut product line sold by the Defendant, Tannewitz, Inc. and its predecessor manufacturer, C.O. Porter Co.. Tannewitz sold the Hydra-cut saw under the trade name, "Copco." See Dep. of Jane Bennett, pp. 6-7, Exhibit "A". On August 8, 2000, the blade of the saw cycled out from its resting position, without appropriate guarding, completely severing the hand and forearm of Plaintiff Alan Fehr. Plaintiff's engineering expert, Richard Colberg, P.E., has opined that the machine, as sold, was defectively designed, leading to Mr. Fehr's injuries. Unfortunately, Mr. Fehr's hand and forearm could not be re-attached.

### History of the "Hydra-Cut" Radial Arm Saw Product Line

In order to evaluate the issues raised by Defendant Tannewitz's Motion for Summary Judgment, it is important to understand the history of the "Hydra-cut" radial arm [1] saw product line.

**1.** *The early years (19?? through 1983) --C.O. Porter Machinery Co. Designs, Manufactures and Sells the Hydra-Cut Radial Arm Saw*

The Hydra-cut radial arm saw at issue was originally manufactured by C.O. Porter Machinery Co. which sold it under the model "43-J" in 1962 [2]. Sometime since 1962, C.O. Porter changed the model name from the 43-J model to the 47-A model. In fact, to this day, parts for the 47-A model are sold by Defendant Tannewitz for the 43-J machine, including for the subject saw involved in this accident. See David Olthouse Dep., p. 5, Exhibit "B"; Phil Hoffman Dep., pp.26-29, Exhibit "C"; See Stoner Dep., pp. 6-7, Exhibit "D".

**2.** *11 days in February, 1983 -- The virtual consolidation and merger of C.O. Porter Machinery Co.*

*under Tannewitz, Inc.'s new brand name, ''Copco''*

On **February 16, 1983** or **February 17, 1983** Tannewitz, Inc. formed a new wholly-owned subsidiary which it named "Copco, Inc.". Certificate of Incorporation of Copco, Inc. dated 2/16/83 filed on 2/17/83, Exhibit "E"; Copco's Application for Certificate of Authority to Transact Business or Conduct Affairs in Michigan, filed on 3/30/83, attached as Exhibit "F". "Copco" is an obvious anagram for "C.O. Porter." This was the first formal step taken by Tannewitz, Inc. and C.O. Porter to consolidate or merge what was soon to be the former C.O. Porter Machinery Co. under Tannewitz's new brand name for the Hydra-Cut radial arm saw -- "Copco."

Thereafter, prior to Copco being issued any authority to transact business from the Michigan Department of Commerce, Corporation & Securities Bureau (which was only *subsequently* issued on March 30, 1983, See Amended Application For Certificate of Authority to Transact Business in Michigan, 7/13/87, Exhibit "G"), on **February 28, 1983**, Copco and Tannewitz entered an agreement with C.O. Porter Machinery Co. to purchase most of C.O. Porter's manufacturing equipment and related assets for $355,000.00. See Asset Purchase Agreement, Exhibit "H"; Wilkerson v. C.O. Porter Machinery Co., 237 N.J. Super. 282, 285 567 A.2d 598 (Law Division, Union County 1989), Exhibit "I"; April 25, 1983 Order of the United States Bankruptcy Court for the Western District of Michigan, In the Matter of C.O. Porter Machinery Co., Case No. 83-00566 (Order Confirming sale of Personal Property), attached as Exhibit "J".

Specifically, C.O. Porter sold all inventory, raw materials, parts, component parts, work in progress, completed products, engineering drawings, manufacturing records/documents, sales materials, customer lists, advertising materials, jigs, tooling fixtures, customer orders, registered service marks, trademarks, copyrights, trade names, computer, computer desk, printer and software, except such items which related to C.O. Porter's former computer numerical control ("CNC") woodworking equipment (the CNC woodworking equipment does not include the "Hydra-Cut" radial arm saw product line). See Asset Purchase Agreement, at Schedule "A", Exhibit "H". The only assets expressly not included in the sale were: C.O. Porter's corporate name, cash, bank accounts, deposits, accounts receivable, office equipment, tools, insurance policies, and leases. Id. The assets included in the sale involved all tangible and intangible assets which related to the successful Hydra-Cut radial arm saw product line. Copco, Inc. continued to ". . .produce the same or similar machinery manufactured by C.O. Porter Machinery. . . " Id. at para. 1. Perhaps most notably, **the terms of this purchase agreement required, as a condition precedent to Copco's obligations, that C.O. Porter file a petition for bankruptcy relief under Chapter 11.** See 2/28/03 Asset Purchase Agreement, para. 6(a), page 9, attached as Exhibit "H".

Not coincidentally, on the same day, **February 28, 1983**, Copco & Tannewitz also entered a 10-year term consulting agreement with C.O. Porter's president, Dan C. Porter, in which it was agreed that Mr. Porter would "assist in developing and marketing products of the same nature as the assets which the Company [Copco, Inc.] is acquiring from C.O. Porter under the Purchase Agreement." See Consulting Agreement,

para. 2, and Guaranty, Exhibit "K". The agreement further contained a covenant that Mr. Porter would not compete with the business of Copco/Tannewitz "related to the assets acquired by [Copco/Tannewitz] pursuant to the Purchase Agreement [of 2/28/83.]" Id. at para. 6, p. 4. Once again, significantly, as a condition precedent to the performance of the consulting agreement, the terms required that the bankruptcy filing be made, as described in the Asset Purchase agreement. Id. at para. 10, p. 6. This agreement, along with the asset purchase agreement, would allow Tannewitz to reap the benefits of C.O. Porter's good will and successful Hydra-Cut saw product line, Daniel Porter's knowledge and experience and ensure that C.O. Porter would no longer be in the business of manufacturing or selling Hydra-cut saws.

Significantly, as it relates to the issue before the Court this agreement included the following pertinent terms:

(1) **Defendant Tannewitz, Inc. guaranteed payment and performance of all the obligations of this agreement on behalf of Copco., Inc.;** and

(2) **the consulting agreement could not be modified, compromised, extended or otherwise dealt with without notice to or consent of Defendant, Tannewitz, Inc.**

Id., see Guaranty (emphasis added). To complete Tannewitz' virtual consolidation of C.O. Porter, under the subsidiary or "brand name", Copco, at least as it related to the Hydra-cut saw product line, finally and not surprisingly, Robert Courts, then president of Tannewitz, see Stoner Dep., p. 22, Exhibit "D" , was also named president of Copco, Inc., See Exhibit "K".

The very next day, on **March 1, 1983**, as required by the two agreements entered into by Copco, Tannewitz, C.O. Porter Machinery Co. and Daniel C. Porter, C.O. Porter Machinery Co., Inc. filed for Chapter 11 bankruptcy protection under the Bankruptcy Code, 11 U.S.C.A.

§ 1101 et seq.. See Wilkerson, 237 N.J. Super. at , 567 A.2d at 285 (Exhibit "I"); Debtor's petition for C.O. Porter, filed dated 3/1/83, Exhibit "L"; Certified Copy of a Corporate Resolution Authorizing Filing of A Petition in Chapter 11, dated 3/1/83, Exhibit "M".

### 3. The Next Fifteen Years (1983-1998) -- Tannewitz Manufactures, Markets and Sells the Hydra-Cut Radial Arm saw under the "Copco" Brand Name

Thereafter, in 1987 C.O. Porter was completely liquidated by Order of Court. See March 5, 1987 Amended Order Closing Case & Bankruptcy Order Confirming Plan of Liquidation, 5/2/85, Exhibit "N"; see also Wilkerson, 237 N.J. Super. at 286, Exhibit "I". Tannewitz, Inc. then continued selling the Hydra-Cut saw under the "Copco" brand name until the early to mid-1990's when sales of the line dwindled off, see Deposition of Bonnell, p. 15, Exhibit "O"; see also Jane Bennett Dep., pp. 6-7, Exhibit "A"

(Accountant/controller for Copco/Tannewitz testified that "Copco" was a "brand name" only and if a customer purchased a "Copco" machine, they would write a check to Tannewitz as Copco had no bank accounts.); see also Pysarchik Dep., p. 13 & 22, Exhibit "P". Tannewitz then revoked Copco's incorporated status in 1998. See Pysarchik Dep., p. 13, Exhibit "P"; see also Certificate of Revocation, Exhibit "Q".

In its motion, Tannewitz attempts to portray itself as merely a manufacturer of band saws, having absolutely nothing to do with the Hydra-cut radial arm saw product line, Copco, or C.O. Porter Machinery. Of course, conspicuously absent from Tannewitz's brief is any mention of the above history of Tannewitz's affirmative actions to consolidate and/or merge C.O. Porter Machinery Co.'s Hydra-Cut saw product line into it, purchase most of its assets, hire C.O. Porter's president as a "consultant", C.O. Porter's Chapter 11 bankruptcy filing the very next day and subsequent liquidation. In fact, a review of all evidence discovered to date reveals that Tannewitz is not at all distinct from Copco, especially considering:

(1) Copco was merely a "brand name", See Jane Bennett Dep., p. 6, Exhibit "A";

(2) Copco had no bank accounts and when a customer purchased a Copco machine or part, the payment would be made to Tannewitz, Bennett Dep., pp. 6-7, Exhibit "A";

(3) when checks were made payable to "Copco", they were deposited into Tannewitz's bank account, See Bennett Dep., p. 7, Exhibit "A";

(4) Jane Bennett, who was identified as Copco's Controller and Accountant, was and is paid her salary by Tannewitz and she is a Tannewitz employee, Bennett Dep., p. 13, Exhibit "A";

(5) when an order came for a Hydra-cut saw, it would be forwarded to Tannewitz's engineering department for completion and filling who in turn forwarded it to the shop foreman, Sterling Sleet, a long-time employee of Tannewitz, See Dep. of Kenneth Bonnell, pp.8-9 & 17, Exhibit "O"; see also Olthouse Dep., pp. 9-10, Exhibit "B";

(6) engineers for the Hydra-Cut saw were employed by and paid by Tannewitz, Bonnell Dep. at p.10, Exhibit "O" ; See also Olthouse Dep., p. 10, Exhibit "B";

(7) assemblers for the Hydra-cut saw were paid by Tannewitz, Olthouse Dep., p. 15, Exhibit "B"; Bennett Dep., p. 7, Exhibit "A";

(8) Tannewitz also employed in its engineering department, Richard Gauw, a former C.O. Porter Machinery Co. employee, Bonnell Dep., p. 61, Exhibit "O";

(9) Rubin Kangas, a former C.O. Porter Machinery Company employee, was hired by and paid by Tannewitz, Inc. to build the Hydra-cut saw, Bonnell Dep., p. 13-15, Exhibit "O"; Bennett Dep., p. 7,

Exhibit "A" ; See also Olthouse Dep., p. 10, Exhibit "B";

(10) After Rubin Kangas, a Tannewitz employee, Ryan Gillette manufactured the Hydra-cut saw, Bonnell Dep., p. 15, Exhibit "O" ; Bennett Dep., p. 7, Exhibit "A";

(11) Copco's business address is and always has been the same as Tannewitz's address. Specifically, the plant and offices for Copco and Tannewitz were located in Grand Rapids, Michigan and but were moved to Jenison, MI, see Bonnell Dep., pp. 59-60, Exhibit "O"; Pysarchik Dep., pp. 32-33, Exhibit "P";

(12) Copco never paid rent to Tannewitz, Bennett Dep., p. 13-14, Exhibit "A";

(13) The Hydra-cut saw was sold by David Olthouse, the current vice president of Tannewitz, See Olthouse Dep., pp. 4-5, Exhibit "B", Hydra-cut saws were sold by Tannewitz employees and Copco had no sales employees; See Pysarchik Dep., p. 31, Exhibit "P";

(14) Morris Pysarchik, Tannewitz's current president, became vice-president and general manager of Copco by 1987, see Amended Application For Certificate of Authority to Transact Business in Michigan, 7/13/87, Exhibit "G", and president of Copco by 1996, See 1996 Michigan Annual Report of Foreign Profit Corporations for Copco, Inc., 4/12/96, Exhibit "R";

(15) Mr. Olthouse, Tannewitz's current vice-president and sales representative for Tannewitz, testified that the 47-A Hydra-cut radial arm saw machine was sold under the "Copco" brand name, See Olthouse Dep., p. 5, Exhibit "B"; and

(16) parts for the Hydra-Cut saw were and are sold by Tannewitz, Inc., See Stoner Dep., pp. 6-7, Exhibit "D".

Finally and most notably, Tannewitz/Copco benefitted from the good will of C.O. Porter Co. Its sales brochure advertises the saw under the COPCO name as follows:

### A DESIGN PROVEN OVER 40 YEARS.

Its literature further states: "Over 40 years of on-the-job service in plants throughout the country have proven the Hydracut 47-A to be the best hydraulically-controlled cut-off saw design in the industry." See advertisements/brochures, attached as Exhibit "T"; see also Wilkerson, 237 N.J. Super. at 287. Another advertisement in the 1984 *Thomas Register*, Vol. 14 for the Hydra-cut Saw brags of "40 years on the cutting edge". Id. Yet another advertisement in the 1984 Thomas Register represents: "Over 40 years on the job in plants throughout the country have proven our Hydracut 47-A to be the best design running." Id. It is important to note that although Tannewitz only formed Copco in February of 1983 (just twenty years ago), in 1984, only a year later, it advertised to the woodworking industry that its Hydra-cut Model 47-A is a "Design Proven Over 40 Years" and boasts of "Over 40 years on-the-job service"; " . . .40 years on the job in plants throughout the country" See advertisements, attached as Exhibit "T"; see also

<u>Wilkerson</u>, 237 N.J. Super. at 287. However, neither the model 47-A nor Copco was in existence for 40 years. These advertisements were obviously and clearly referring to C.O. Porter's former 43-J model and its design which **was** in use for over 40 years by the time of these advertisements in 1984. Moreover, in the <u>Wilkerson</u> case, Copco admitted "it purchased assets of the actual manufacturer of the [hydra-cut saw], C.O. Porter Machinery Co. ('C.O. Porter') in bankruptcy and **continued to produce a similar model saw**." <u>Wilkerson</u>, 237 N.J. Super. at 284, 567 A.2d at 599 (emphasis added). Finally, Copco sold the 43-J model before the model's name was changed to 47-A. See Bonnell Dep., 24, Exhibit "O".

By a comparison of Tannewitz's advertisements and marketing strategy with its present motion, it seeks the benefit of C.O.Porter's longstanding good will and the Hydra-cut's "proven" design without the burden of liabilities which attach to the product line, pursuant to Pennsylvania law. For the reasons outlined below, material issues of fact exist and Defendant's motion must be denied.

## II. LEGAL STANDARD

### A. Standard for Summary Judgment--Generally

"Summary judgment is appropriate when the record discloses no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); see also <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). In reviewing the record, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.' <u>Armbruster v. Unisys Corp.</u>, 32 F.3d 768, 777 (3d Cir. 1994). The moving party bears the burden of showing that the record reveals no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); <u>Anderson</u>, 477 U.S. at 247. Once the moving party has met its burden, the non-moving party must go beyond the pleadings to set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585-86, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). 'There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.' <u>Anderson</u>, 477 U.S. at 249. 'Such affirmative evidence - regardless of whether it is direct or circumstantial - must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.' <u>Williams v. Borough of West Chester</u>, 891 F.2d 458, 460-61 (3d Cir. 1989)." <u>Flores v. The Home Depot, Inc.</u>, 2003 U.S. Dist. LEXIS 5510, *9-*10 (E.D.Pa. April 3, 2003) (Schiller, J.).

### B. Standard for Summary Judgment -- Successor Liability

Under Pennsylvania law, whether a corporation is a successor which meets the legal prerequisites to be held vicariously liable for actions of its predecessor is a question for the jury to decide. <u>Sehl v. Vista Linen Rental Serv., Inc.</u>, 2000 PA Super. 331, 763 A.2d 858 (2000) (question of whether successor to a rug service company would be liable for the actions of its predecessor was properly decided by jury after proper jury charge on exceptions to general rule of no liability upon successor company); <u>Childers v. Power Line Equip. Rentals</u>, 452 Pa. Super. 94, 681 A.2d 201 (1996) (jury issue was presented whether Emerson could be liable as a successor after purchasing assets from A.B. Chance and continuing to sell

the former's products); <u>Dawejko v. Jorgensen Steel Co.</u>, 290 Pa. Super. 15, 28, 434 A.2d 106 (Pa.Super. 1981) (jury was entitled to find that company was a successor corporation subject to liability where it purchased assets of the predecessor, continued to manufacture and sell the product of its predecessor, and acquired the predecessor's good will); Cf. <u>Conway v. White Trucks, Division of White Motor Corp.</u>, 692 F.Supp. 442 (M.D.Pa. 1988) (parties *voluntarily agreed* to adjudicate issue of the Plaintiffs' successor liability claim without a jury prior to trial of the products liability claim itself; court granted summary judgment to Defendants on other grounds).

Of particular interest, at least one court has held that whether Copco was a successor company which could be held liable for Hydra-Cut saw product sold by its predecessor, C.O. Porter Machinery Co., presented a mixed question of law and fact which turned on disputed facts. <u>Wilkerson v. C.O. Porter Machinery Co.</u>, 237 N.J. Super. 282, 292, 567 A.2d 598 (Law Division, Union County 1989) (summary judgment denied as factual dispute existed relating to the issue of whether company was a successor which could be liable for product line originally sold by predecessor corporation, C.O. Porter Machinery Co. noting that the issue presented a "mixed question of law and fact".).

# III. LEGAL ARGUMENT

## A. *Product Line Exception--Successor Liability*

In Pennsylvania, a successor corporation can be held liable for a product manufactured or sold by its predecessor (or *its* predecessor) under certain circumstances, which are present in the case at bar. See <u>Dawejko v. Jorgensen Steel Co.</u>, 290 Pa. Super. 15, 434 A.2d 106 (Pa.Super. 1981). The Pennsylvania Superior Court has held: "The general rule is that when one company sells or transfers all of its assets to a successor company, the successor does not acquire the liabilities of the transferor corporation merely because of the succession to the transferor's assets." <u>Id.</u>, 434 A.2d at 107. "However, the general rule does not apply and liability attaches to the successor when one of the following is shown:

1) The purchaser expressly or impliedly agrees to assume such obligation;

2) The transaction amounts to a consolidation or merger;

3) The purchasing corporation is merely a continuation of the selling corporation;

4) The transaction is fraudulently entered into to escape liability;

5) The transfer was not made for adequate consideration and provisions were not made for the creditors of the transfer; and

6) The successor undertakes to conduct the same manufacturing operation of the transferor's product lines in essentially an unchanged manner. The successor is then strictly liable for injuries caused by defects in the product line, even if previously manufactured and distributed by the transferor. [This has been labeled the product-line exception.]" Childers v. Power Line Equipment Rentals, 452 Pa. Super. 94, 681 A.2d 201, 212 (Pa.Super. 1996) (citation omitted); see also Conway v. White Trucks, a Div. of White Motor Corp., 885 F.2d 90 (3d Cir. 1989); Philadelphia Electric Company v. Hercules, Inc., 762 F.2d 303 (3rd Cir.1985) (applying Pennsylvania successor liability law).

In addition, under the law of Pennsylvania, the product-line exception is where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation **or its predecessor.** Dawejko, 290 Pa.Super. at 23, *citing,* Ramirez v. Amsted Industries, Inc., 86 N.J. 332, 358, 431 A.2d 811, 825 (1981) (emphasis added).

The purpose of the "product line exception" is to serve the social policies underlying strict products liability. e.g., Dawejko, 290 Pa.Super. at 26, 434 A.2d at 111. The Dawejko court relied upon and adopted the law of New Jersey regarding successor liability of product manufacturers stated in Ramirez v. Amsted Industries, Inc., 86 N.J. 332, 431 A.2d 811 (1981).

The Eastern District of Pennsylvania Court, in Rivera v. Mossberg Industries, Inc., 2000 U.S. Dist. LEXIS 5184, * 8-*9 (E.D.Pa. April 20, 2000) (Buckwalter, J.) has considered the liability of a subsequent product manufacturer and discussed the development and reasoning behind the Superior Court's holding in Dawejko:

There are certain factors that must be considered when applying the product line exception, including whether the successor corporation advertised itself as an ongoing enterprise; whether the successor maintained the same product, name, personnel, clients, and properties; whether the successor acquired the predecessor's name and good will; and whether it required the predecessor to dissolve. 434 A.2d at 111. Other factors that the court may apply include those from the "tripartite test" for imposing strict liability upon successors, consisting of three factors: (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk- spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business. Dawejko, 434 A.2d at 109, (citing Ray v. Alad Corporation, 19 Cal. 3d 22, 31, 136 Cal. Rptr. 574, 579, 560 P.2d 3, 9).

Even though Pennsylvania recognizes these factors as important to an analysis of successor liability, the Dawejko court found that the formulation from Ramirez v. Amsted Indus. Inc., 86 N.J. 332, 431 A.2d 811, was the best and adopted it as the rule. Dawejko, 434 A.2d at 111.

. . . The court cautioned that it did not want to frame this exception too tightly, saying that "it should be phrased in general terms, so that in any particular case the court may consider whether it is just to impose liability on the successor corporation." 434 A.2d at 111 (emphasis added). However, the product line exception does not apply for the successor if the predecessor company still exists to be held liable for the injury. Conway, 885 F.2d at 91.

The product line exception, as it was adopted in Pennsylvania, was developed in response to deficiencies in the holdings of strict liability and products liability cases. Ramirez, 431 A.2d at 825. Generally, corporations are held strictly liable for injuries from defects in products that they manufacture. Corporations make allowances for such liability by spreading the risk cost out to consumers. Id. at 821. When the manufacturers ceased to exist as viable entities, consumers were left with a void, there being no existing entity from which they could seek compensation for their injuries. Pennsylvania court decisions have, so to speak, filled the void by holding successor corporations strictly liable for the defects of the original manufacturer, in certain circumstances.

The Superior Court stated, in Hill v. Trailmobile, Inc., 412 Pa. Super. 32, 603 A.2d 602 (1992): "[t]he product-line exception is a remedy which was created to afford relief to *plaintiffs*, victims of manufacturing defects who, due to the sale or transfer of the Manufacturing corporation, otherwise would have no avenue of redress for injuries caused by defective products." The Hill Court noted that:

[p]rior to adoption of the product-line exception, courts throughout the country had provided relief for plaintiffs injured by a product manufactured by a predecessor corporation by expanding or extending one of the five recognized exceptions. However, such extension of the 'continuation' exception was generally restricted to situations in which there was only one corporation after the transfer and there was also a common identity of officers, directors, and stock between the selling and purchasing corporations. [citations omitted] Plaintiffs injured by products manufactured by predecessor corporations purchased by multiple corporations, or which shared no identity of corporate structure were, unfortunately, left without a remedy in strict liability. Even the expansion of the 'continuation' exception to include successor corporations which were in a business of a similar nature failed to provide adequate relief. In becoming one of the few states to adopt the product-line exception to successor liability, this court explained its change in philosophy as 'an attempt to implement the 'social policies underlying strict products liability.'' Dawejko, 290 Pa.Superior Ct. at 26, 434 A.2d at 111, quoting Ramirez v. Amsted Industries, Inc., 86 N.J. 332, 358, 431 A.2d 811, 825 (1981). The court explained that strict tort liability for manufacturers of defective products rests on the proposition that: 'the cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business.' . . . Thus, the "the

paramount policy to be promoted by the rule is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them." (citations omitted).

Id., 290 Pa.Superior Ct. at 22, 434 A.2d at 109 (emphasis added).

The <u>Hill</u> court also stated that the product-line exception to the general rule of no liability for successor corporations may only be applied when the following three circumstances have

each been established:

(1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business,

(2) the successor's ability to assume the original manufacturer's risk-spreading rule, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being employed by the successor in the continued operation of the business. <u>Dawejko</u>, 290 Pa.Super. at 22, 434 A.2d at 109, quoting <u>Ray v. Alad Corp.</u>, 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977). However, it is important to note that the Pennsylvania Supreme Court has **never** imposed the requirement that the three <u>Ray</u> factors, outlined above and cited by Defendant, relying upon <u>Kradel v. Fox River Tractor Co.</u>, 308 F.3d 328, 332 (3d Cir. 2002), are a *prerequisite* to the application of the product line exception. In fact, given that the Pennsylvania Superior Court's holding in <u>Dawejko</u>, expressly adopting the New Jersey Supreme Court's version of the product line exception in <u>Ramirez v. Amsted Indus. Inc.</u>, 86 N.J. 332, 431 A.2d 811, with the proviso and cautionary language that it not be framed "too tightly", plaintiff submits that the three <u>Ray</u> factors are not at all necessary to the application of the exception, as argued by Defendant. Even if this 3-part test were to be applied; however, there exists sufficient evidence that plaintiff can meet all three parts. At the very least, a triable issue of fact is presented in the case at bar, as outlined below.

Further, in considering what constitutes a transfer of assets, the <u>Wilkerson</u> court observed that : "[o]ne commentator, recommending the 'product line continuity theory,' implies that successor liability does not require transfer of all of the assets, but only those associated with the product line in issue. *See* Phillips, 'Product Line Continuity and Successor Corporation Liability,'" <u>Wilkerson</u>, 237 N.J. Super. at 292.

Finally, the Third Circuit Court of Appeals and other courts within this circuit have held that Pennsylvania courts have adopted and the Pennsylvania Supreme Court would adopt the "product line" exception to the general rule of no liability upon a successor corporation. See, e.g., <u>Conway v. White</u>

Trucks, Division of White Motor Corp., 885 F.2d 90, 95 (3d Cir. 1990); Tracey v. Winchester Repeating Arms Co., 745 F. Supp. 1099, 1105 (E.D.Pa. 1990).

**B. Tannewitz, Inc. Undertook the Same Manufacturing Operation of C.O. Porter's Hydra-Cut Radial Arm Saw Product Line**

Courts have found that a corporation could be held liable as a successor corporation where it has sold the same product line as its predecessor. One such example is the seminal case in Pennsylvania which established the "product line" exception -- Dawejko v. Jorgensen Steel Co., 290 Pa. Super. 15, 28, 434 A.2d 106 (Pa.Super. 1981). In Dawejko, the court held that a jury was entitled to find that a company was a successor corporation subject to liability where it: (a) purchased assets of the predecessor; (b) continued to manufacture and sell the product of its predecessor; and (c) acquired the predecessor's good will.

Another example is the Superior Court's opinion in Childers v. Power Line Equip. Rentals, 452 Pa. Super. 94, 681 A.2d 201 (1996). In Childers, the court found that sufficient evidence was submitted at trial for the jury to properly find that the successor corporation, Emerson, was liable for a product sold by its predecessors, A.B. Chance and its "Pitman" division. In that case, the court held that:

Here, the evidence established that Emerson purchased all of A.B. Chance's assets, including the Pitman division, continued to manufacture and sell the digger-derrick truck under the name of its predecessor (Pitman) and enjoyed the good will of its predecessor's (Pitman's) reputation. Under the "product-line" exception, this Court has held that where one corporation acquires all of the manufacturing assets of another corporation and undertakes essentially the same manufacturing operation as the selling corporation, as was the case here, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor . . .

Id. at 116.

Applying the facts in the case at hand to the recognized "product-line" theory of successor liability, summary judgment must be denied to Defendant because material issues of fact exist and application of the product-line exception imposes liability upon Tannewitz. In seeking summary judgment on the successor issue, Tannewitz completely ignores numerous relevant facts which have been discovered in this case and rather represents to this court that:

(1) "There is no evidence that COPCO manufactured, sold, serviced, or sold parts for the Model 43-20J." See Defendant's Brief at p. 8. However, this representation is directly contradicted by the sworn testimony of Kenneth Bonnell, Tannewitz's 30(b)(6) designee who testified that Copco sold the 43-J model before the model's name was changed to 47-A. See Bonnell Dep., p. 24, Exhibit "O".

(2) The sale of C.O. Porter's assets was dated May 11, 1983. See Defendant's Memorandum of Law, p. 1. However, a review of the Asset Purchase Agreement , Exhibit "H" reveals it was made and entered into on February 28th, 1983 the day *before* the bankruptcy filing of C.O. Porter Machinery Co. and the same day Copco/Tannewitz entered a 10-year term consulting agreement with Daniel C. Porter who was C.O. Porter's President. As outlined more fully below, this is extremely significant in showing that Tannewitz/Copco's purchase of C.O. Porter's assets while at the same time having C.O. Porter's president agree to consult with Tannewitz (and use his efforts to promote the Hydra-cut saw product line), caused the bankruptcy filing and eventual liquidation of C.O. Porter Machinery Company. In fact, the asset purchase agreement and consulting agreement *required* the bankruptcy filing.

(3) Tannewitz asserts that only personal property was sold by C.O. Porter Machinery Co.. See Defendant's Memorandum of Law, pp. 1-2. However, a review of the Asset Purchase Agreement reveals that C.O. Porter sold all inventory, raw materials, parts, component parts, work in progress, completed products, engineering drawings, manufacturing records/documents, sales materials, customer lists, advertising materials, jigs, tooling fixtures, customer orders, registered service marks, trademarks, copyrights, trade names, computer, computer desk, printer and software, except such items which related to C.O. Porter's former computer numerical control ("CNC") woodworking equipment (the CNC woodworking equipment does not include the "Hydra-Cut" radial arm saw product line). Id., at Schedule "A".

(4) "There is no evidence that Tannewitz and COPCO had any connection other than occupying the same premises. According to Mr. Pysarchik, COPCO was not a subsidiary of Tannewitz. Tannewitz's only involvement with a hydra-cut/cut-off saw was that it did sell parts for the C.O. Porter 47A, but only for the Model 47A hydra-cut/cut-off saw." See Defendant's Memorandum of Law, pp. 2-3. These assertions are completely untrue and contradicted by the evidence, outlined more fully above, that: Copco was merely considered to be a "brand name" of Tannewitz; Copco had no employees and all engineers, assemblers, sales personnel, and the accountant/controller who were involved with the Hydra-Cut saw were in fact Tannewitz employees; payment for Copco machines (which only includes the Hydra-Cut saw) was made directly to Tannewitz and deposited in Tannewitz's account(s); parts for the Hydra-Cut saw were and are sold by Tannewitz, Inc.; Tannewitz formed Copco and entered the agreement to purchase assets and the consulting agreement with Daniel Porter before Copco was ever authorized to transact business; and Tannewitz guaranteed payment of the consulting agreement terms and expressly reserved the right to consent to any modification, compromise, extension of the agreement. See above, pages through . Moreover, the advertisements for the Hydra-cut saw expressly identify Copco as a "subsidiary of Tannewitz, Inc.". See Exhibit "T".

Tannewitz makes these representations relying almost exclusively upon the testimony of its current president, Morris Pysarchik to set forth the fiction that Tannewitz had nothing to do with Copco. In fact, at his deposition, Mr. Pysarchik denied knowing the identity of any subsequent directors of Copco, after Robert Courts, its first president. See Pysarchik Deposition, p. 25, Exhibit "P". In stark contrast, a review of the Michigan, Department of Treasury, Corporation Division filings reveal that it was Mr. Pysarchik himself who became vice-president and general manager of Copco by 1987, see Amended Application For Certificate of Authority to Transact Business in Michigan, 7/13/87, Exhibit "G", and president of

Copco by 1996, See 1996 Michigan Annual Reports of Foreign Profit Corporations for Copco, Inc., dated 4/12/96, Exhibit "R". Of course, Mr. Pysarchik held these positions with Copco while at the same time he was president of Tannewitz, Inc..

In the present case, Copco/Tannewitz manufactured, marketed and sold the Hydra-cut saw product line for many years *after* its purchase of the assets and talent to do so on February 28, 1983. Significantly, Copco/Tannewitz marketed to its potential customers in the woodworking industry that the hydra-cut cut-off saw was "A DESIGN PROVEN OVER 40 YEARS" which was an obvious reference to the Hydra-Cut model 43-J, as is at issue in the present case. Neither Copco nor Tannewitz sold the hydra-cut 47-A saw for 40 years -- instead they were relying upon the good will and benefit that came with the entire product line's success under its former seller, C.O. Porter Machinery Co.. Yet, ironically, Tannewitz now seeks to divorce itself from the proclamation of the "proven design" of the Hydra-cut saw and moves this Honorable Court for entry of summary judgment asserting that its subsidiary (which it even refuses to acknowledge as a subsidiary), Copco, only sold the 47-A model which had nothing to do with any prior model in this product line. This is contradicted by its admission in the Wilkerson case that "it purchased assets of the actual manufacturer of the [hydra-cut saw], C.O. Porter Machinery Co. ('C.O. Porter') in bankruptcy and **continued to produce a similar model saw**." Wilkerson, 237 N.J. Super. at 284, 567 A.2d at 599 (emphasis added). Further, it si contradicted by the testimony of Kenneth Bonnell that *Copco* sold the 43-J model before the model's name was changed to 47-A. See Bonnell Dep., 24, Exhibit "O".

Tannewitz cannot have the benefit of the "proven" design of this over 40 year-old product line without the burden that may attach in the form of liability for its defective design. Tannewitz has already reaped the benefit of the sales of the Hydra-cut saw (all payments for the Hydra-cut saw product line were made directly to Tannewitz) but now seeks to be relieved of the burden that might attach.

As outlined above, Tannewitz further seeks to divorce itself from its own subsidiary, Copco, in seeking summary judgment. However, in adopting the "product line" theory of liability, the Superior Court of Pennsylvania stated, in Dawejko, *supra*, the purchaser of assets would be liable not only for the product line of the previously manufacturer/distributor, but also *its* predecessor, which in this case includes C.O. Porter Machinery Co..

Recently, in 2000, Judge Buckwalter noted, relying upon the language in Dawejko: "[t]here are certain factors that must be considered when applying the product line exception, including whether the successor corporation advertised itself as an ongoing enterprise; whether the successor maintained the same product, name, personnel, clients, and properties; whether the successor acquired the predecessor's name and good will; and whether it required the predecessor to dissolve." Dawejko, 434 A.2d at 111. In the case at bar, Tannewitz/Copco continued to sell a Hydra-cut saw, which it advertised was a "design proven over 40 years." Clearly this is an attempt to share in the good will of its predecessor and a representation of an ongoing enterprise, at least the enterprise represented by the proven Hydra-cut product line. Further, the Superior Court of New Jersey, in the case of Wilkerson v. C.O. Porter Machinery Co., 237 N.J. Super. 282, 285 567 A.2d 598 (Law Division, Union County 1989), has already considered the liability of Tannewitz's wholly-owned subsidiary, Copco, for the hydra-cut cut-off saw product line and relied upon the facts that: Copco advertised that the hydra-cut saw was "a design proven

over 40 years."

Moreover, Tannewitz/Copco employed the seller corporation's (C.O. Porter Machinery Co.'s) employees, including Ruben Kangas, the assembler of the Hydra-cut saw, Richard Gauw, a former C.O. Porter Machinery Co. employee, Bonnell Dep., p. 61, Exhibit "O", and contracted exclusively with Daniel C. Porter, the seller's president. Further, rather than simply sell the Hydra-cut saw under the Tannewitz name, it choose an obvious anagram of the seller's name, "Copco" which is similar to "C.O. Porter Machinery Co.".

Tannewitz/Copco not only purchased manufacturing assets, but also customer lists, advertising materials, intellectual property (copyrights, trade names, service marks) and virtually anything related to the Hydra-cut line. As outlined above, the agreement called for the sale of: all inventory, raw materials, parts, component parts, work in progress, completed products, engineering drawings, manufacturing records/documents, sales materials, customer lists, advertising materials, jigs, tooling fixtures, customer orders, registered service marks, trademarks, copyrights, trade names, computer, computer desk, printer and software, except such items which related to C.O. Porter's former computer numerical control ("CNC") woodworking equipment (the CNC woodworking equipment does not include the "Hydra-Cut" radial arm saw product line). See Asset purchase agreement, at Schedule "A". This clearly is not a situation where a company within the same industry seeks to purchase some equipment to expand the capacity of its production or modernize its equipment. Rather, this is the wholesale takeover of an entire product line, complete with the expertise of the seller's president and CEO, Daniel C. Porter under an exclusive agreement as a consultant.

As discussed fully above, both agreements of February 28, 1983 (Asset purchase agreement and consulting agreement) , expressly required the predecessor (C.O. Porter Machinery Company) to petition the Bankruptcy Court under Chapter 11. In fact, it was a condition precedent to the sale of assets and the consulting agreement. This further argues in favor of application of the "product line" exception to the general rule of no liability upon the successor corporation because Mr. Fehr's ability to seek redress from C.O. Porter was eliminated. See Dawejko, *supra*.

There exists even more evidence in support of the application of the product line theory. Given that Copco was formed less than two weeks before the sale of assets, consulting agreement and bankruptcy filing of C.O. Porter, there is evidence, when viewed in the light most favorable to Fehr, that Tannewitz's actions caused the destruction of Alan Fehr's remedies against the selling corporation, C.O. Porter Machinery Co.. Because C.O. Porter no longer exists, Fehr cannot turn to the original manufacturer for recourse due to the defective product which caused the amputation of his forearm and hand -- the Hydra-cut radial arm saw. Not only was C.O. Porter's bankruptcy filing made immediately after the sale of the assets, but there exists no evidence that C.O. Porter attempted to continue its sales and manufacturing business in *any* way after the Chapter 11 filing, before liquidating in 1985 and dissolving in 1987. Certainly, the exclusive consulting agreement with C.O. Porter's president, Daniel Porter, ensured that C.O. Porter could not continue in the cut-off saw business. C.O. Porter never exited bankruptcy and instead dissolved.

In addition, to this day, Tannewitz exclusively sells replacement parts for the Hydra-cut saw product line. The requirements for application of the Pennsylvania rule regarding successor liability for a product line are met in the case at bar such that Defendant's motion for summary judgment must be denied.

**C. Tannewitz's Purchase of Virtually All of the Assets of C.O. Porter Machinery Company Amounts To a Consolidation or Merger And/Or Represents a Continuation of the Former C.O. Porter Machinery Co.**

Before the Superior Court's adoption of the "product line" exception to the general rule of no liability upon a successor corporation, Pennsylvania Courts and the Third Circuit Court of Appeals recognized that a successor corporation could be liable for the actions of its predecessor if the former corporation merged with the latter corporation, or the sale of assets could be viewed and treated as a merger, based upon the reality of the transaction. Knapp v. North America Rockwell Corp., 506 F.2d 391 (3d Cir. 1974). In Knapp, "the court acknowledged that in form the transaction between the predecessor corporation and the successor corporation was a sale of assets rather than a merger, and that, therefore, liability could not be imposed under the merger exception to the general rule that a sale of corporate property by one company to another does not carry liability with it. Nevertheless, the court reversed. It based this decision on the conclusion that a Pennsylvania appellate court would hold that the particular facts of the transaction were such that it 'should be treated as a merger.'" Dawejko, 290 Pa.Super. at 24.

In the present case, as outlined above, virtually all of C.O. Porter's assets were sold, or at least all of those assets relating to the Hydra-cut product line, to Tannewitz/Copco in 1983 for $355,000.00. Given that key employees, including the assembler and Daniel Porter were also hired or contracted by Copco/Tannewitz, and C.O. Porter ceased conducting any manufacturing or sales business after the sale and bankruptcy, the transaction in reality amounts to a merger or consolidation of C.O. Porter into Copco/Tannewitz. This exception applies irrespective of the nature of the business, in this case the sale of cut-off saws, as it merely looks to determine if the degree of the asset sale is equivalent to a merger. In effect, the asset transfer of 1983, combined with the consulting agreement entered into by Daniel C. Porter, which included a covenant not to compete and exclusivity of his consulting services, stripped C.O. Porter of the ability to continue in the cut-off saw business. In short, C.O. Porter, with the exception of the CNC woodworking machinery, became Copco and Tannewitz, its owner obtained the profits of the sales of the new brand name, Copco.

**D. The Product-Line Theory Must be Applied Upon Consideration of the Three-part Test [3] Set Forth in Ray v. Alad Corp., 19 Cal.3d 22, 136 Cal. Rptr. 574, 560 P.2d 3 (Cal. 1977) ("The Ray Factors")**

*As outlined supra, p. 16, the Pennsylvania Supreme Court has not required the application of the Ray factors (or three-part test) as a prerequisite to the "product line" theory. Moreover, given that the Dawejko court adopted the product-line theory from the New Jersey Supreme Court, which cautions against any rigorous adherence to any particular factors when considering application of the theory,*

plaintiff submits the Pennsylvania Supreme Court would not require the three-part test as a pre-requisite. Specifically, the <u>Dawejko</u> court held that the <u>Ray</u> factors were only to be weighed and considered in applying the product line exception analysis. <u>Dawejko</u>, 434 A.2d at 111. The <u>Dawejko</u> court characterized these factors as "advisory" and expressly excluded them from its formulation of the product line exception. <u>Id.</u> Admittedly, the Third Circuit Court of Appeals, in <u>Kradel v. Fox River Tractor Co.</u>, 308 F.3d 328, 332 (3d Cir. 2002), has characterized the Superior Court's later opinion in <u>Hill</u> as requiring the plaintiff to meet the <u>Ray</u> 3-part test. As outlined below, plaintiff meets the requirements of the 3-part test such that the product line exception must be applied.

## 1. The virtual destruction of the plaintiff's remedies against the original manufacturer caused by the acquisition of the business

The <u>Wilkerson</u> court noted that the New Jersey Supreme Court held: ". . . our Supreme Court sees the transfer of assets and the manufacturer's unavailability to answer in damages as the triggering circumstances and not the precise role of the transferee nor the form of the transfer."

Specifically, in this case, both the sales agreement with C.O. Porter Machinery Co. and the consulting agreement with Daniel C. Porter, C.O. Porter Machinery co.'s president required the immediate filing of Chapter 11 bankruptcy protection, which caused the destruction of Alan Fehr's remedies. Moreover, the sale was agreed to **prior to the bankruptcy filing** such that this is not the sale of assets in bankruptcy, but rather the sale of assets causing and requiring bankruptcy and the destruction of the plaintiff's (and other victims') remedies against the former manufacturer/seller, C.O. Porter Machinery Co.. Further, given that the consulting agreement accompanied the sale of assets from C.O. Porter Machinery Co. to Tannewitz/Copco, this took the transaction even a step further. Daniel C. Porter, C.O. Porter's president, was contractually and exclusively obligated to provide his expertise in the Hydra-cut saw product line to Tannewitz/Copco. Neither Daniel C. Porter nor C.O. Porter could compete in this product line. There exists no evidence that C.O. Porter conducted any further manufacturing or sales activity once these deals were struck, thus leading to C.O. Porter's inevitable liquidation in 1985 and dissolution in 1987.

Tannewitz does not and cannot point to any other event or cause of the destruction of Mr. Fehr's remedies against C.O. Porter Machinery, other than the sale of assets, consulting agreement to Tannewitz under its subsidiary or "brand name", Copco.

Further, there exists no manufacturer or seller against whom Mr. Fehr may assert a claim, other than Tannewitz. C.O. Porter has dissolved and Copco ceased to exist as of 1998.

Defendant cites to the cases of <u>Dale v. Webb Corp.</u>, 252 F.Supp.2d 186 (E.D.Pa. March 26, 2003) (Robreno, J.) and <u>Tracey v. Winchester Repeating Arms</u>, 745 F. Supp. 1099 (E.D.Pa. 1990) as controlling and somehow analogous to the case at bar. However, both cases are readily distinguished from the present case, as discussed below.

In <u>Tracey</u>, the court declined to apply the product line exception because it found that the plaintiff's

remedies could not have been caused by the purchaser's acquisition of the former manufacturer's assets while the former manufacturer was in receivership. The present case is the mirror opposite of the facts in <u>Tracey</u>. As discussed above, the agreements to sell C.O. Porter's Hydra-cut product line and retain Daniel C. Porter as an exclusive consultant (as well as the actions to form Copco) were undertaken in February, 1983 -- before the bankruptcy filing of C.O. Porter in March, 1983 , liquidation of the company in 1985 or dissolution in 1987. More importantly, the sale of assets and consulting agreement expressly required the Chapter 11 bankruptcy filing and Mr. Porter's exclusive continued efforts on behalf of Tannewitz/Copco. This is not the simple sale of assets while a company was in receivership, as was the case in <u>Tracey</u>, but rather was the sale of assets and other agreements causing the bankruptcy (the filing of which was a requirement of both agreements) and eventual dissolution of C.O. Porter Machinery Co.. The <u>Tracey</u> court relied upon the fact that the buying company's asset purchase had nothing to do with the seller's eventual financial difficulties. <u>Id.</u> at p. 1109. By contrast, viewed in the light most favorable to Plaintiff, Tannewitz's/Copco's purchase of virtually all assets **<u>while at the same time exclusively retaining C.O. Porter's president, Daniel C. Porter</u>** under the consulting agreement had <u>everything</u> to do with C.O. Porter's financial difficulties. There exists no evidence of record that after the sale of assets C.O. Porter ever manufactured or sold another saw again in its existence. Further, given that C.O. Porter's president had an obligation to develop and market the Hydra-cut saw for Copco/Tannewitz, it was this sale of assets which caused the financial problems with C.O. Porter.

Defendant's recitation of <u>Dale v. Webb Corp.</u>, 252 F.Supp.2d 186 (E.D.Pa. March 26, 2003) (Robreno, J.) is similarly inapposite. In <u>Dale</u> the court found that the first <u>Ray</u> requirement was not met where the destruction of the plaintiff's remedies was caused due to the death of the seller, a sole proprietor, Mr. Knost, not by the sale of assets. <u>Id.</u> at 193 ("Thus, the court finds that it was Knost's death, and not Webb's acquisition of Reed's bending machine business, which caused the destruction of Dale's remedy against the original manufacturer of the bending machine."). In the present case, the seller and original manufacturer, C.O. Porter, was a corporation and not a sole proprietor. The corporation dissolved due to its bankruptcy filing and non-continuation of sales of saws, which is all directly attributable to the sale of the assets and talent to Tannewitz/Copco.

## 2. The successor's ability to assume the original manufacturer's risk-spreading role

This second <u>Ray</u> factor is easily met in the case at bar. Tannewitz/Copco can either purchase liability insurance to cover itself for the liabilities stemming from defective products, including the Hydra-Cut saw or choose to self-insure. Notably, Defendant does not even deny that this <u>Ray</u> factor is or can be met in the present case in its brief. Under traditional policy governing strict products liability law in Pennsylvania, manufacturers and sellers reaping the benefits of a product line and its reputation "proven over 40 years" are in a better position to incur the cost of protecting against risks than the injured victim/users of the defective product.

## 3. The fairness of requiring the successor to assume a responsibility for defective products that was a

*burden necessarily attached to the original manufacturer's good will being employed by the successor in the continued operation of the business*

*Tannewitz and Copco clearly accepted the benefit of the good will from the Hydra-cut product line which had been established by C.O. Porter. As outlined in detail above, although Copco/Tannewitz purchased the product line in 1983, by 1984, it began relying upon the Hydra-cut's "proven design" which had been "proven" "over 40 years" which was clearly referring to the C.O. Porter manufactured Hydra-cut saw. Defendant argues that because it did not take C.O. Porter's name, it could not have benefitted from any good will. However, clearly, in taking the assets, equipment, customer lists, advertisements, marketing materials, employees and consulting with Daniel C. Porter, exclusively, Tannewitz/Copco took everything <u>but</u> the name. Defendant cannot credibly argue that it did not benefit from the good will of the selling corporation, C.O. Porter.*

### E. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UNDER THE FAILURE TO WARN THEORY AND NEGLIGENCE THEORY MUST BE DENIED

*Defendant cites to the fact that it had no continuing contractual service obligation to the owner of the Hydra-cut saw, plaintiff's employer, Bally Block, and therefore had no duty to warn or act reasonably. However, simply because no contractual service obligation was in existence does not relieve Copco/Tannewitz of its duty to act reasonably. Material issues of fact exist on these issues such that summary judgment must be denied. In particular, there exists no dispute that the owner of the defectively-designed machine regularly purchased replacement parts directly from Copco/Tannewitz. See invoices for purchase of replacement parts, dated 1986-1996, Exhibit "U". Tannewitz and Copco regularly transacted business with the owner of the machine and thus had a relationship which should impose a duty.*

*Moreover, subsequent versions of the Hydra-cut saw were designed differently, which, if communicated to the owner/user could have prevented Mr. Fehr's injuries. Specifically, the 47-A incorporated "two-hand control, for optimal operator safety, requires that each of the two buttons be held down to operate blade travel." See Copco/Tannewitz brochure, Exhibit "T". Plaintiff's engineering expert, Richard Colberg, P.E., opines that:*

*The subject saw should have been equipped with two-hand start controls, requiring both of the operator's hands on the control buttons to start the cycle and to remain on the buttons during the forward part of the stroke.*

. . .

*There is no technical reason that these design changes could not have been made to the subject saw prior to Mr. Fehr's injury. **In fact, the Tannewitz Model 47-A cross-cut saw, the apparent successor to the C.O. Porter Model 43J, is equipped with two-hand start controls.** Two-hand start controls have been in continuous use on many types of industrial machinery at least since the 1950's. **Tannewitz knew that Bally Block had two Hydra-cut saws and should have arranged to have them retrofitted with two-hand controls before Mr. Fehr's injury.***

*See Colberg report, Exhibit "V", pp. 4-5 (emphasis added). Thus, there exists sufficient, evidence, when viewed in the light most favorable to Plaintiff, that Tannewitz knew that Bally Block had the older machines with a different and unsafe design, such that a duty should be imposed to warn.*

*Tannewitz goes on to argue that all negligence claims must be dismissed because the product-line exception, if applied, is relevant to strict liability theories <u>only</u>. However, Tannewitz overlooks the fact that the failure to warn theory rests upon **its own negligence** and not upon vicarious liability, upon which the strict products liability theories rely. Simply put, plaintiff's claims stated against Tannewitz rests upon <u>both</u> vicarious liability and direct liability for its own negligence in failing to warn.*

## *IV. CONCLUSION*

*Wherefore, for the foregoing reasons, Plaintiff respectfully requests that this Honorable Court dent Defendant's Motion for Summary Judgment and enter an appropriate Order.*

*Respectfully submitted,*

***SOLOFF & ZERVANOS, P.C.***

***By:***

*John N. Zervanos, Esquire*

*Jeffrey P. Fritz, Esquire*

***Counsel for Plaintiff, Alan Fehr***

*Dated: <u>September 22, 2003</u>*

*1. The radial arm saw is also known as a "cut-off" saw and is unique in that the blade is controlled by hydraulics which cause the blade to come out of its resting position to cut the wood.*

*2. The machine bears the serial number 62-3697 designating a 1962 manufacture date.*

*3. As outlined, supra, p. 16, Plaintiff initially submits that the Pennsylvania Supreme Court does not require strict application of the so-called Ray three-part test as a prerequisite to the application of the product line theory. However, even if applied, Plaintiff can show that he meets all three parts of this test.*