**LAW OFFICES OF SOLOFF & ZERVANOS**

John N. Zervanos, Esquire

Identification No.# 49615

Jeffrey P. Fritz, Esquire

Identification No.#78124

1525 Locust Street, 8th Floor

Philadelphia, PA 19102

(215) 732-2260 Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF PENNSYLVANIA

**ALAN FEHR** :

6365 Chestnut Hill Road :

Coopersburg, PA 18036 :

Plaintiff :

vs. : NO. 02-3145

:

**TANNEWITZ, INC.** :

0794 Chicago Drive :

Jenison, MI 49428 : Defendant :

## PLAINTIFF'S SUPPLEMENTAL BRIEF TO

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## FACTS:

Plaintiff files the within supplemental brief in opposition to Defendant's Motion for Summary Judgment:

## A. DEFENDANT TANNEWITZ WAS A SELLER OF THE HYDRA-CUT SAW PRODUCT LINE

Defendant Tannewitz maintains that it did not manufacture and/or sell the 47A Hydra-cut saw. Furthermore, it maintains that the 47A Hydra-cut saw was not "part of or related to" the 43J model or product line. At oral argument held on September 29, 2003, Tannewitz provided this Court with an affidavit executed by engineer Kenneth Bonnell attesting that Copco manufactured and sold the model 47A Hydra-cut saw. Mr. Bonnell attests that the 47A is distinctive and not a part of the 43J model, in that it "utilized" a two hand control so as to activate the "cutting cycle". In an addition, the 47A included an "anti-repeat circuit" to prevent multiple cycling. Furthermore, Mr. Bonnell states that the 47A contained a different electrical and hydraulic package than the 43J. Accordingly, Tannewitz is insisting that the 47A is a complete and distinct Hydra-cut saw and, is in no way related to the 43J.

## LEGAL ARGUMENT

Remarkably, Mr. Bonnell's new testimony is in stark contrast to his deposition testimony when he testified that the 43J was the predecessor to the 47A:

**Question:** Do you know before there was a 47A that Copco was selling before the

47A?

**Answer:** I believe it was a 43J.

**Question:** How do you arrive at that belief.?

**Answer:** From --well, from this and the 43J's were built by Copco**.**

Attached hereto is Exhibit "1". See page 24 Deposition Transcript of Kenneth Bonnell.

Ken Bonnell knows as a long tenured Tannewitz engineer that it was Tannewitz, with the assistance of C.O. Porter's successful product line, that continued to manufacture and market the hydra-cut saw by emphasizing and relying on the 43J's "40 year proven design". It was, indeed, Tannewitz who negotiated with Dan Porter, and it was Tannewitz and only Tannewitz that had the authority to enter into an agreement with C.O. Porter before Copco was even authorized to transact business in Michigan. Tannewitz then created Copco for the purpose of manufacturing, selling and marketing the Hydra-cut saw line as a product line and design proven for over 40 years.

Jane Bennett was the controller/accountant for Tannewitz and was identified, at least on some of the documents, as the controller for Copco, testified that Copco did not have employees.

She further notes that she never received and/or wrote checks in Copco's name. Copco did not have a bank account. It did not own equipment, supplies, furniture, or for that matter was there proof of its physical existence, anywhere. Jane Bennett referred to Copco as "brand name" and confirmed that Copco was not a "separate company".

**Question:** It is my understanding that at one time, Copco was physically present in this facility on Chicago Drive; is that correct? Am I correct to be that understanding?

**Answer:** I guess I don't understand by Copco. There has never been a separate company here.

**Question:** I'm sorry.

**Answer:** There has never been a separate company here.

**Question:** There was a Copco business here; is that right?

**Answer:** No

See p. 5 deposition testimony of Jane Bennett attached hereto and marked as Exhibit "4".

**Question:** Did Copco have a bank account?

**Answer:** No

**Question:** Since you have been here since 1996, you have never seen their bank

account?

**Answer:** No I have not.

**Question:** If a customer purchased the machine under the Copco brand name, would they right a check to Tannewitz or to Cocpo?

**Answer:** To Tannewitz.

See p. 6 deposition testimony of Jane Bennett marked as Exhibit "4".

**Question:** If a customer purchase a part for a Copco machine would they write that check to Tannewitz or Copco?

**Answer:** As far as I know, yes Tannewitz.

**Question:** Have you ever seen a check since you've be here made payable to Copco?

**Answer:** I have about 10 years, maybe.

**Question**: Do you know what it was for.

**Answer:** No. I don't recall.

**Question**: Where was the check deposited?

**Answer:** Tannewitz's account.

For all intents and purposes, Tannewitz Vice President, David Olthouse confirms that it was Tannewitz who manufactured, sold, marketed and serviced the 47A and not Copco.

**Question:** If someone ordered a 47A, can you take me through the

process of the sales call or how it comes in, to the point where it

goes out the door.

**Answer:** The order would come in through the company and be processed.

**Question:** Alright. Well, let me stop you. The order would come in to which company?

**Answer:** Tannewitz.

**Question:** And then its processed. How is it processed?

**Answer:** It would be sent to engineering department.

**Question:** And that would be Tannewitz's engineering department.

**Answer:** Yes

**Question:** What would the engineering department do with the order?

**Answer:** They would release it to the shop.

**Question:** Okay. What would the shop do with it?

**Answer:** Build it.

**Question:** And that would be Tannewitz's shop?

**Answer:** Yes

**Question:** Who would be responsible for building it within the shop?

**Answer:** The assembler for the machine.

**Question:** Do you know who those assemblers were?

See pages 9 and 10, deposition transcript of David Olthouse attached hereto and marked as Exhibit "3".

Mr. Olthouse then identified the assembler as Rubin Kangus. Mr. Bonnell identified not only Rubin Kangus, but also Ryan Gilette, a second employee Tannewitz employed to build and

assemble the 47A saw. See p.14 deposition transcript of Kenneth Bonnell attached hereto and marked as Exhibit "1". Kangus and Gilette were paid by Tannewitz and were not employees of Tannewitz but, ex-

employees of C.O. Porter. Remarkably, they were never employees of Copco.

**Question:** At one time, was there a Rubin Kangus that worked here?

**Answer:** Yes. I recall that name, yeah.

**Question:** Was he paid by Tannewitz, if you know?

**Answer:** Tannewitz, Yes

**Question**: How about a gentleman by the name of Ryan Gilette?

**Answer:** Yes. He work for ...Yes he worked here.

**Question**: Was he paid by Tannewitz or Copco.

**Answer:** Tannewitz**.**

See p. 7 and p.8 deposition transcript of Jane Bennett.

Tannewitz, assertion that it did not, nor ever manufacture, market, and service the hydra-cut product line is grossly misleading when, in fact, its senior employees have confirmed under oath that Tannewitz was responsible for the product line and, indeed, was paid for a saw built and sold by its assemblers and market staff. Tannewitz is playing a "corporate shell" game to relieve itself of liability. Unfortunately, the history of transaction between Tannewitz and Daniel Porter speaks for itself.

C.O. Porter's President, Daniel C. Porter assisted, developed and marketed the 47A for Tannewitz pursuant to the consulting agreement between himself and Copco, a.k.a. Tannewitz.

Furthermore, Porter agreed to a "covenant not to compete clause":

For the period 10 years from the effective date of this agreement,

neither consultant nor any employer, representative thereof, nor

any corporation, partnership or other entity in which he has or will

have an interest as an officer, director shareholder, or partner, shall

either directly or indirectly (i)compete with or (ii)own, manage, operate,

join, control, or participate in the ownership, management, operation

or control of, or be connected with in any manor, any business in

the United States which is in competition with, the business of the

company related to the assets acquired by the company pursuant

to the purchasing agreement. . .

See p.4 of the Consulting Agreement attached hereto and marked as Exhibit " 5".

One only has to look at the Purchase Agreement, specifically the Schedule A entitled

"Assets Included in Sale", to realize that the buyer, a.k.a. Tannewitz, purchased everything except the following:

1. Drawings related to C.O. Porter's former computer numerical control.

(CNC) woodworking equipment

2. Documents related to sellers CNC woodworking equipment.

3. Advertising materials related to sellers former CNC woodworking equipment.

4. Gigs and tooling fixtures related to C.O. Porter's former CNC woodworking equipment.

C.O. Porter maintained its corporate name, cash bank accounts, deposits, accounts receivable, office equipment, furniture, supplies, non-inventory machinery, equipment, tools, insurance policies, lease hold interest and lease hold improvements. See Schedule A of Purchase Agreement attached hereto and marked as Exhibit "6". Significantly, Copco, a.k.a. Tannewitz, agreed to purchase all the inventory not related to CNC, engineering drawings not related to CNC, manufacturing records and documents not related to CNC, sales materials, customer lists, advertising materials, not related to CNC, and customer orders for both parts and machines.

These particular items are clearly related to the current line of Hydra-cut saws which would have included the 47A. It is clear from the time line produced during oral argument (Seeattached history of the hydra-cut saw attached hereto and marked as Exhibit "16" ) the corporate records, and the testimony referenced above, that Tannewitz intended to enter into hydra-cut saw business and in order to successfully do so, hired C.O. Porter's President, Daniel C. Porter through an exclusive consulting agreement to advise, promote and market the 47A with the provision that Mr. Porter and C.O. Porter would not compete with Tannewitz in the Hydra-cut saw industry. As such, C.O. Porter was required to filed bankruptcy and with obviously very little incentive to promote and market its remaining business interest, file for bankruptcy and then, later dissolved. There is no evidence to support the fact that Porter pursued its remaining business enterprise. Arguably, with its President committed to Tannewitz, C.O. Porter's financial outlook was, indeed, predictable. There exists no evidence that C.O. Porter ever conducted one iota of business following the filed of the bankruptcy on March 1, 1983.

In the meantime, Copco /Tannewitz continued to market itself as a Hydra-cut saw manufacturer with "40 Years on the Job Service". Dan Porter can only boast 40 years experience not Tannewitz. See advertisements attached hereto and marked as Exhibit "7".

For Tannewitz to argue that the 47A is not part of and/or related to the same product design as the 43J, is ludicrous and is simply without credibility. The term product line is defined as "a particular kind of product or merchandise" ie. a nice line of shoes.....a group of products related to each other by marketing, technical or in use considerations. See, e.g., WWW.thebusinessinabox.com. Glossary of Business Terms, Exhibit " ".

Accordingly, the only remaining inquiry, then, is whether the 47A is indeed a separate and distinct product. The 43J was marketed and sold as a hard Hydra-cut saw. The 47A was marketed and sold as a Hydra-cut saw. Each saw operates so that when the operated pushes a button, the saw's cycling action is initiated, and after making its cut, returns to its "home" position. While Tannewitz, through Bonnell's Affidavit, suggests that the 47A Hydra-cut saw has very separate and distinct features, namely, that it was equipped with a two hand control device necessary to activate the cutting cycle and equipped with an anti-repeat circuit to prevent multi cycles, the purpose and utility of the machine has not changed. The operator places a piece of wood onto the cutting table, engages the hand control and the saw in turn is activated by cycling out from its "home" position and begins its cutting process. If anything, the 47A was made safer with these improvements. Most significantly, however, a review of the testimony by those who used both the 43J and 47A at Bally Block, will demonstrate that they are essentially identical. See Affidavit of David Ritter attached hereto and marked as Exhibit "8".

**Question:** When I say machine, I am referring to both Hydra-cut saws.

Did you actually have the opportunity to work both of them?

**Answer:** From what I recall over the years, I was probably put on each one over the years, yes, they were both basically identical machines.

See p. 7 deposition transcript of David Ritter attached hereto marked as Exhibit "9".

**Question:** To your knowledge, are the Hydra-cut saws, the two cross-cut saws, do you consider them to be the same, or could they be different?

**Answer:** I consider them to be the same.

See p.38 deposition transcript of Phil Hoffman, maintenance supervisor for Bally Block, attached hereto and marked as Exhibit "10".

**Answer:** "But see, we have two "Hydra cut saws" like that. Now, if they got rid of the one, I don't know which one they got rid of, and put this new one. So I don't know which one they got rid of".

See p. 18 deposition testimony of Richard Updegrove attached hereto and marked as Exhibit " 11".

Question: Were they both ...did they both operate the same way?

**Answer:** No. The one against the wall that Al was on had a different kind of cycling button. It had a palm pad behind a shield, and the one that I operate all the time

had just a plain button.

**Question:** No Shield.

**Answer:** There was no shield.

**Question**: Outside of that did they work the same way.

**Answer:** Yeah, except they were opposite. They were right opposite...

The one that I operated most of the time was fed from the left

to the right. The one that was against the wall was from right to left.

See deposition testimony of Larry Ackerman p. 5 and 6 attached hereto and marked as

Exhibit "12".

**Question:** Did you work that machine. Were you assigned to that machine?

**Answer:** I worked on both machines for six years.

**Question**: When you say both machines, what other machine?

**Answer:** We had another saw.

**Question:** Similar to the one that was involved in the accident.

**Answer:** Mum hum

**Question:** Is that yes?

**Answer:** Yes

**Question:** Was that an exact type of saw?

**Answer:** It was one that came in and out. It wasn't set up that way. It had buttons to push. It was like a little different.

**Question:** But the saw would come out and you would run wood across to cut it.

**Answer:** Yes.

See p. 9 and 10 deposition transcript of Steven Moser as Exhibit " ". Steve Moser went on to testify that the only distinct difference between the two saws was that the subject saw had a guard behind it where as the second saw recognized to be the 47A had a big "red button". When you hit the button, the saw would cycle and cut and return to its home position.

See p. 13 and 14 deposition testimony of Steve Moser as Exhibit "13".

When referencing the machine, Moser went on to testify"

**Question:** You would face the machine as your facing it in the picture, correct?

**Answer:** You would use your left hand.

**Question:** Use your left hand to do what?

**Answer:** Push this while your holding there piece of wood...

**Question:** And then what would happen then with the saw.

**Answer:** Well then, with your right hand you would be holding the wood and then you kick this and the saw would come out and your piece would be laying across here and then, there's belt that would take the piece of wood off. Same thing except opposite.

See p. 15, 16, and 17 deposition transcript of Steve Moser attached hereto and marked as Exhibit "13".

**Question:** There was another machine that was similar to the machine that Alan operated that was regularly operated, correct.

**Answer:** Yes.

**Question:** Can you describe for us what the name the type of machine. Was it a Band saw or a crosscut saw.

**Answer:** Crosscut saw.

See p. 6 and 7 deposition transcript of Timothy Hoffman attached as Exhibit "14".

**Answer:** ...didn't happen very often, but it happened once in a while, the saws (47A and 43J) when you hit the button it would come out and go back and forth a few times.

**Question:** recycling by themselves.

**Answer:** Yes.

**Question:** So you hit the button one time and you have this action by the

saw that would come out and go back in and then, come out again.

**Answer:** Right. Now I can tell you that the front saw did it a lot more

than the back saw did, but the back saw did do it.

See p. 11 deposition transcript of Craig Eddinger attached hereto and marked as Exhibit "15".

More importantly, if the 43J (involved in Alan Fehr's accident) was in need of a part, Bally Block would look to Tannewitz/Copco for those parts.

**Question:** So, if you wanted to find out the maintenance history of the

Hydra-cut saw involved in Alan Fehr's accident, there is no

specific file to look at Bally Block. Is that fair to say.

**Answer:** That's fair to say, Yes. There is not a file saying that this

was done on this day, this was done on this date. Probably

not exactly.

**Question:** You had Phil Hoffman go downstairs to see if he could

find something specific to the Hydra-cut saws, and he came up with Copco file and showed us purchase orders.

**Answer:** Copco, I believe was the supplier we were using for parts for that saw, Yes.

**Question:** Can you think of any other suppliers that you would use for those

saws.

**Answer:** No. I think that's it. Copco.

See deposition testimony of Dave Ritter as Exhibit "8".

Defendant provides an Affidavit from its Engineer, namely Kenneth Bonnell, indicating that parts for the 43J and 47A are not interchangeable. If indeed this is the case, plaintiff sets forth the testimony from Bally Block's plant manager and maintenance personnel indicating that Copco, a.k.a. Tannewitz was, in fact, selling parts for the 43J using 47A parts.

**Question:** Can you think of anything that was a chronic problem as to with

either one of the Hydra-cut saws when you were in the

maintenance department?

**Answer:** No, just looking over these purchase orders, it seems like the biggest

problems we had with them saws was leaks on the cylinder. As you

can see we have kits ordered to repair leaks.

**Question:** Could parts have been ordered from some other companies for those

Hydra-cut saws.

**Answer:** I believe there wasn't any other supplier at the time, that's why we were using Copco. I can't say definitely that we haven't ordered anything, but it should be in this file if it was ordered. I don't recall ordering any parts from anywhere else other than Copco.

See p. 13 and 14 of David Ritter's deposition transcript attached hereto and marked as Exhibit "9".

Tannewitz would have us believe

"40 years of on the job" service in plants throughout

the country have proven the Hydra-cut 47A to be the

best hydraulically controlled cut-off saw designed in the

industry"

is somehow different than the 43J when those who used them can barely explain in their subtle differences.

If one was to trace the product line back 40 years, one is led to the 43J model which was the only model in existence prior to the 47A. The 47A adopted most, if not all of the design features proven and effective for the 40 years because the features were proven effective in the 43J.

Furthermore, as was required by Dan Porter, this design was utilized to successfully continue to produce a similar model saw, namely the 47A. Tannewitz can not, now, come before this Court and argue that it did not benefit from a design it claimed was proven for 40 years in the industry when prior to entering into its agreement with C.O. Porter it never manufactured a single hydra-cut saw but limited its manufacturing of saws to ban saws, only. Obviously, Tannewitz set out to benefit from the goodwill of C.O. Porter in hopes that it would become a

vendor in the Hydra-cut saw industry. Tannewitz after placing a Copco label on the 47A, manufactured, sold, and marketed the product line which it would have not been able to assume had it not acquired all of C.O. Porter's assets related to the Hydra cut saw's production and essentially undertake the same manufacturing operation and more importantly, continued to utilize a design that was proven effective for "40 years".

Tannewitz can not credibly argue that it does not qualify as a successor corporation under the product line exception, when, in fact, it did everything possible to sabotage C.O. Porter's interest in the Hydra-cut saw industry and substitute itself instead of C.O. Porter/Copco as a manufacture, seller and marketer of a design proven and effective for 40 years. Simply put, why was the 47-A and 43-J the same product and "design proven over 40 years" when it was time to sell saws, but now, according to Tannewitz, these are not the same products?

**B. A JURY QUESTION IS PRESENTED AS TO WHETHER TANNEWITZ'S PURCHASE OF VIRTUALLY ALL ASSETS OF C.O. PORTER, ALONG WITH THE EXCLUSIVE CONSULTING AGREEMENT WITH C.O. PORTER'S PRESIDENT, DANIEL C. PORTER, CAUSED THE DESTRUCTION OF PLAINTIFF'S REMEDIES AGAINST C.O. PORTER, THE ORIGINAL SELLER**

As outlined in Plaintiff's initial response, Plaintiff submits that the Pennsylvania Supreme Court would not require strict application of the three "Ray factors." See Plaintiff's Memorandum of Law, pp. 16-17. However, even if applied, a jury question is presented which precludes the grant of summary judgment. Specifically, Pennsylvania Courts have held that whether an entity is subject to liability under the "product line" exception is a question for the jury. See, e.g., Childers v. Power Line Equip. Rentals, 452 Pa. Super. 94, 681 A.2d 201 (1996) (jury issue was presented whether Emerson could be liable as a successor after purchasing assets from A.B. Chance and continuing to sell the former's products); Dawejko v. Jorgensen Steel Co., 290 Pa. Super. 15, 28, 434 A.2d 106 (Pa.Super. 1981) (jury was entitled to find that company was a successor corporation subject to liability where it purchased assets of the predecessor, continued to manufacture and sell the product of its predecessor, and acquired the predecessor's good will); Cf. Conway v. White Trucks, Division of White Motor Corp., 692 F.Supp. 442 (M.D.Pa. 1988) (parties voluntarily agreed to adjudicate issue of the Plaintiffs' successor liability claim without a jury prior to trial of the products liability claim itself; court granted summary judgment to Defendants on other grounds).

Of particular interest, at least one court has held that whether Copco was a successor company which could be held liable for Hydra-Cut saw product sold by its predecessor, C.O. Porter Machinery Co., presented a mixed question of law and fact which turned on disputed facts.Wilkerson v. C.O. Porter Machinery Co., 237 N.J. Super. 282, 292, 567 A.2d 598 (Law Division, Union County 1989) (summary judgment denied as factual dispute existed relating to the issue of whether company was a successor which could be liable for product line originally sold by predecessor corporation, C.O. Porter Machinery Co. noting that the issue presented a "mixed question of law and fact".).

Defendant argues that because Tannewitz filed a Chapter 11 bankruptcy, rather than Chapter 7, a jury could never find that its actions were the cause of the destruction of Plaintiff's remedies against the former seller of the Hydra-cut saw product line, C.O. Porter. However, in making this argument, Tannewitz ignores that it is not only the bankruptcy filing of C.O. Porter which led to C.O. Porter's demise, but also the exclusive consulting agreement with C.O. Porter's former president, Daniel C. Porter. These actions, completed on the same day, February 28, 1983, and considered together demonstrate that C.O. Porter could no longer exist in any business. Defendant cites to hypothetical sales of other product lines, including the "Little Guy" or the "Big Guy", yet there exists absolutely no evidence of record that C.O. Porter engaged in **any** business after its bankruptcy filing of March 1, 1983. Tannewitz is without evidence that any action(s) other than its purchase of virtually all of C.O. Porter's assets and exclusive consulting agreement with Dan Porter, caused the bankruptcy filing and dissolution of C.O. Porter.

## C. APPLICATION OF THE "PRODUCT LINE" OR "CONTINUATION" EXCEPTIONS TO IMPOSE LIABILITY UPON TANNEWITZ DOES NOT REQUIRE A SHOWING OF THE ELEMENTS OF A DE FACTOMERGER

In its supplemental brief, Tannewitz goes to great lengths to lay out the elements of the de facto merger exception to the general rule of no liability to successor corporations. However, application of either the "product line" exception or the mere "continuation" exception do not require that the elements of the merger or de facto mereger exception be proven at all.

In particular, the Pennsylvania Superior Court, in Hill v. Trailmobile, Inc., 412 Pa. Super. 32, 603 A.2d 602 (1992) noted that:

[p]rior to adoption of the product-line exception, courts throughout the country had provided relief for plaintiffs injured by a product manufactured by a predecessor corporation by expanding or extending one of the five recognized exceptions. **However, such extension of the 'continuation' exception was generally restricted to situations in which there was only one corporation after the transfer and there was also a common identity of officers, directors, and stock between the selling and purchasing corporations. [citations omitted] Plaintiffs injured by products manufactured by predecessor corporations purchased by multiple corporations, or which shared no identity of corporate structure were, unfortunately, left without a remedy in strict liability. Even the expansion of the 'continuation' exception to include successor corporations which were in a business of a similar nature failed to provide adequate relief. In becoming one of the few states to adopt the product-line exception to successor liability, this court explained its change in philosophy as 'an attempt to implement the 'social policies underlying strict products liability**."Dawejko, 290 Pa.Superior Ct. at 26, 434 A.2d at 111, quotingRamirez v. Amsted Industries, Inc., 86 N.J. 332, 358, 431 A.2d 811, 825 (1981). The court explained that strict tort liability for manufacturers of defective products rests on the proposition that: 'the cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business.' . . . Thus, "the paramount policy to be promoted by the rule is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them." (citations omitted).

Id., 290 Pa.Superior Ct. at 22, 434 A.2d at 109 (emphasis added). Thus, it was the shortcomings of some of the other exceptions, as applied to victims injured due to defective products, which resulted in the adoption of the product line exception in the first place. As outlined previously, Plaintiff submits that the present scenario fits squarely within the product line exception. The application of this exception does not require any showing that there is a continuity of ownership/stockholders or transfer of stock, as argued by Defendant. See Defendant's Supplemental Brief, pp. 3-4.

## D. THE FACT THAT MORRY PYSARCHIK, CARL FLURY AND DAVID OLTHOUSE FIRST BECAME STOCKHOLDERS OF TANNEWITZ IN APRIL 1996 IS OF NO RELEVANCE

Defendant desperately attempts to argue to this Honorable Court that the three present shareholders of Tannewitz, Inc. did not allegedly become shareholders until April 1996, after the dissolution of Copco. Defendant cites no legal support for the significance of this allegation. The liability of Mssrs. Pysarchik,

Flury and Olthouse is not at issue. The only issue is whether Tannewitz, Inc. was a seller of the Hydra-cut saw product line or otherwise was a successor to C.O. Porter. That these individuals allegedly did not become shareholders until 1996 is of no import in answering this question.

Moreover, interestingly, although Mr. Pysarchik allegedly was not a shareholder of Tannewitz until 1996, he was the vice-president and general manager of Copco by 1987, see Amended Application For Certificate of Authority to Transact Business in Michigan, 7/13/87, Exhibit "G" to Plaintiff's Response, and president of Copco by 1996, See 1996 Michigan Annual Report of Foreign Profit Corporations for Copco, Inc., 4/12/96, Exhibit "R", to Plaintiff's Response.

**CONCLUSION:**

For the foregoing reasons, plaintiff respectfully request that this Honorable Court deny defendant's Motion for Summary Judgment and enter into an appropriate order.

Respectfully submitted,



Dated:

JOHN N. ZERVANOS, ESQUIRE

Attorney for Plaintiff